O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MELINDA D. ROBINSON,               ) Case No. EDCV 12-0998-JPR
                                   )
                 Plaintiff,        )
                                   )
           vs.                     ) MEMORANDUM OPINION AND ORDER
                                   ) AFFIRMING THE COMMISSIONER
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of             )
Social Security,[1]                )
                                   )
                 Defendant.        )
                                   )

I.   PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying her applications for Social Security disability insurance
benefits ("DIB") and Supplemental Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).
This matter is before the Court on the parties' Joint
Stipulation, filed February 27, 2013, which the Court has taken

_____

        [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on May 29, 1965.  (AR 41, 505.)  She attended some high school and college without graduating from either.  (AR 505-06.)  She previously worked as a preschool teacher and a gas-station cashier.  (AR 106-07, 113-15, 169, 514-15.)

On November 8, 2006, Plaintiff filed applications for DIB and SSI, alleging that she had been unable to work since June 7, 2005, because of major depressive disorder, post-traumatic stress disorder, hypothyroidism, idiopathic chronic constipation, degenerative joint disease, lumbar radiculopathy, bilateral carpal tunnel syndrome, and asthma.  (AR 29, 32-33.)  After her applications were denied, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 29.)  A hearing was held on September 22, 2008, at which Plaintiff, who was represented by counsel, testified, as did a medical expert and a vocational expert ("VE").  (AR 29.)  In a written decision issued December 2, 2008, ALJ Jesse J. Pease determined that Plaintiff was not disabled.  (AR 29-40.)  The Appeals Council later denied review.  (AR 16, 504.)  Plaintiff did not appeal that decision to the U.S. District Court (AR 16, 504), and it therefore became final and binding, see 20 C.F.R. §§ 404.981, 416.1481; Taylor v. Heckler, 765 F.2d 872, 875 (9th Cir. 1985).

On April 2, 2009, Plaintiff filed new applications for DIB and SSI.  (AR 16, 41-42, 85-86, 488-96, 504.)  Plaintiff alleged

2

1   that she had been unable to work since November 28, 2008, because

2   of post-traumatic stress disorder, bipolar disorder, back pain,

3   carpal tunnel syndrome, and Graves' disease, among other things.

4   (AR 16, 85-86. 105.)  A hearing was held before ALJ Helen E.

5   Hesse on September 29, 2010.[2]  (AR 502-17.)  Plaintiff, who was

6   represented by counsel, testified, as did a VE.  (Id.)  In a

7   written decision issued November 4, 2010, ALJ Hesse found that

8   Plaintiff was not disabled.  (AR 16-25.)  On April 24, 2012, the

9   Appeals Council denied Plaintiff's request for review.  (AR 3-7.)

10  This action followed.

11  **III. STANDARD OF REVIEW**

12       Pursuant to 42 U.S.C. § 405(g), a district court may review

13  the Commissioner's decision to deny benefits.  The ALJ's findings

14  and decision should be upheld if they are free of legal error and

15  supported by substantial evidence based on the record as a whole.

16  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

17  1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

18  742, 746 (9th Cir. 2007).  Substantial evidence means such

19  evidence as a reasonable person might accept as adequate to

20  support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter

21  v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

22  a scintilla but less than a preponderance.  Lingenfelter, 504

23  F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,

24

25       [2]   Before the September 2010 hearing, Plaintiff amended
    her disability onset date to December 3, 2008 (AR 84), the day
26  after ALJ Pease issued his decision (AR 29-40), which ALJ Hesse
    observed was "because the prior decision render[ed] everything
27  from that date back res judicata" (AR 504).  In her decision, ALJ
    Hesse nonetheless states that Plaintiff's alleged onset date was
28  November 28, 2008.  (AR 16.)

882 (9th Cir. 2006)).   To determine whether substantial evidence
supports a finding, the reviewing court "must review the
administrative record as a whole, weighing both the evidence that
supports and the evidence that detracts from the Commissioner's
conclusion."   Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.
1996).   "If the evidence can reasonably support either affirming
or reversing," the reviewing court "may not substitute its
judgment" for that of the Commissioner.   Id. at 720-21.   Further,
when a previous decision has found a claimant not disabled, in
any later claim the ALJ will "apply a presumption of continuing
nondisability and determine that the claimant is not disabled"
unless the claimant rebuts the presumption.   Acquiescence Ruling
97-4(9), 1997 WL 742758, at *3; see also Chavez v. Bowen, 844
F.2d 691, 693 (9th Cir. 1988) ("The principles of res judicata
apply to administrative decisions, although the doctrine is
applied less rigidly to administrative proceedings than to
judicial proceedings.").

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or which has lasted, or is expected
to last, for a continuous period of at least 12 months.   42
U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
(9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in
assessing whether a claimant is disabled.   20 C.F.R.

4

§§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv),

_____

    [3]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

416.920(a)(4)(iv).  The claimant has the burden of proving that
she is unable to perform past relevant work.  Drouin, 966 F.2d at
1257.  If the claimant meets that burden, a prima facie case of
disability is established.  Id.  If that happens or if the
claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at
828 n.5; Drouin, 966 F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since November 28, 2008.  (AR
19.)  At step two, the ALJ concluded that Plaintiff had the
severe impairments of hypothyroidism, idiopathic chronic
constipation, degenerative joint disease, lumbar radiculopathy,
bilateral carpal tunnel syndrome, asthma, obesity, and "mood
disorder with depressed mood and anxious features and a
questionable substance abuse disorder."  (Id.)  At step three,
the ALJ determined that Plaintiff's impairments did not meet or
equal any of the impairments in the Listing.  (AR 19-20.)  At
step four, the ALJ found that Plaintiff retained the RFC to
perform light work[4] that was limited to

_____

     [4]    "Light work" is defined as involving "lifting no more
than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b),
416.967(b).  The regulations further specify that "[e]ven though
the weight lifted may be very little, a job is in this category

sitting for 8 hours out of an 8 hour day, and
standing/walking for 6 hours out of an 8 hour day with
normal breaks; occasional posturals in terms of climbing
stairs, bending, balancing, stooping, kneeling, crouching
and crawling except she is precluded from climbing
ladders/scaffolds and working at unprotected heights; no
concentrated exposure to dust, fumes, gases or chemicals;
no forceful gripping/grasping with both upper
extremities; and no holding any one object more than 15
minutes at a time.

(AR 20.)   The ALJ further concluded that because of Plaintiff's
mental impairments, she "require[d] a work environment with no
more than a moderate degree of stress from all sources,
especially interpersonal from supervisors and peers; and no jobs
requiring hypervigilance, being in charge of the safety
operations of others, intense interpersonal interactions, or
supervising others."   (<u>Id.</u>)   Based on the VE's testimony, the ALJ
concluded that Plaintiff was capable of performing her past work
as a cashier.   (AR 25.)   Accordingly, the ALJ determined that
Plaintiff was not disabled.   (<u>Id.</u>)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) rejecting the
opinion of her treating psychiatrist, Marc Blumberg, and (2)

when it requires a good deal of walking or standing, or when it
involves sitting most of the time with some pushing and pulling
of arm or leg controls."   <u>Id.</u>   A person capable of light work is
also capable of "sedentary work," which involves lifting "no more
than 10 pounds at a time and occasionally lifting or carrying
[small articles]" and may involve occasional walking or standing.
§§ 404.1567(a)-(b), 416.967(a)-(b).

finding Plaintiff's subjective symptom testimony not credible.
(J. Stip. at 7.)

A.  The ALJ Properly Evaluated the Medical Evidence

Plaintiff contends that the ALJ failed to properly consider
the opinions of treating psychiatrist Blumberg.  (J. Stip. at 7-
14.)  Remand is not warranted on that basis, however, because the
ALJ provided legally sufficient reasons for according little
weight to that opinion.

1.  Applicable law

Three types of physicians may offer opinions in Social
Security cases: "(1) those who treat[ed] the claimant (treating
physicians); (2) those who examine[d] but d[id] not treat the
claimant (examining physicians); and (3) those who neither
examine[d] nor treat[ed] the claimant (non-examining
physicians)." Lester, 81 F.3d at 830.  A treating physician's
opinion is generally entitled to more weight than the opinion of
a doctor who examined but did not treat the claimant, and an
examining physician's opinion is generally entitled to more
weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded
more weight than the opinions of nontreating physicians because
treating physicians are employed to cure and have a greater
opportunity to know and observe the claimant.  Smolen v. Chater,
80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's
opinion is well supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in the record, it should be given
controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

8

If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion.  <u>Id.</u>  Indeed, the ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

> 2.  <u>Relevant facts</u>

From April 2007 until March 2009, Plaintiff saw a therapist at Nouvell and Nouvell Counseling Services about twice a month. (AR 277-83, 287-96, 299-304.)  From May 2007 until at least August 2010, Plaintiff received psychiatric treatment at the Hemet Mental Health Clinic.  (<u>See</u> AR 192, 445.)

On October 28, 2008, Dr. Blumberg of the Hemet Mental Health Clinic noted that Plaintiff had appropriate appearance, affect,

9

attention, concentration, and speech.  (AR 362.)  Plaintiff's mood was calm and mildly to moderately depressed.  (Id.)  Dr. Blumberg noted that she was "[s]ymptomatic but [s]table."  (Id.)  On January 13, 2009, Dr. Blumberg noted that Plaintiff had appropriate appearance, affect, attention, concentration, and speech; she was mildly to moderately depressed and had some suicidal ideation but no intent or plan.  (AR 202.)  On February 17, 2009, Dr. Blumberg noted that Plaintiff had appropriate and neat appearance, mildly depressed mood but no suicidal ideation, and appropriate affect, attention, concentration, and speech.  (AR 201.)  Plaintiff had a partial response to medication and was "symptomatic but stable."  (Id.)

On March 9, 2009, after Plaintiff reported having suicidal thoughts, Plaintiff's therapist recommended that she go to the hospital.  (AR 280.)  That day, Plaintiff went to Riverside County Regional Medical Center, reporting that she was depressed and having suicidal thoughts and had "tried to crash [her] car."[5] (AR 320.)  Plaintiff was noted to be calm, cooperative, and crying, with slow psychomotor activity and restricted affect.  (AR 326.)  She had relevant, coherent, and slow speech; a goal-directed thought process; restricted affect; and a depressed and sad mood.  (Id.)  She did not have delusions or hallucinations.  (AR 327.)  Plaintiff was alert and oriented, with good attention,

---

[5]     During her hospitalization, Plaintiff told a social worker that she had "t[aken] her car at 2:00 AM and wanted to run into a telephone pole but instead crashed [her] car into [a] dirt hill."  (AR 344.)  In her April 2009 function report, Plaintiff wrote that she "once woke up in the middle of the nigh[t] and took the car and tr[i]ed to hit a telephone pole" but "ended up missin[g] and rip[p]ed [the] bumper."  (AR 159.)

concentration, and memory.  (Id.)  Plaintiff reported a history of childhood sexual abuse.  (AR 326, 344.)  She was admitted for psychiatric treatment, diagnosed with post-traumatic stress disorder, and assigned a global assessment of functioning ("GAF") score of 25.[6]  (AR 320, 329-30.)  Plaintiff was discharged on March 13, 2009, with diagnoses of bipolar disorder and polysubstance disorder.  (AR 196.)

On March 20, 2009, Plaintiff reported to her primary-care physician, Dr. Thomas E. Oliveira, that she no longer had suicidal ideation and was feeling "a lot better" since her inpatient hospitalization.  (AR 242.)  On March 31, 2009, Plaintiff failed to report for an appointment with Dr. Blumberg.  (AR 198.)  That day, Dr. Blumberg noted that Plaintiff suffered from major depression and post-traumatic stress disorder.  (AR 352.)  On April 27, 2009, Dr. Blumberg noted that Plaintiff had an appropriate and neat appearance, mildly to moderately depressed mood, blunted affect, appropriate attention and concentration, appropriate speech, and no suicidal ideations.  (AR 197.)

On May 13, 2009, a state-agency consulting psychiatrist, H. Amado, reviewed Plaintiff's medical records and completed a

---

[6]  A GAF score represents a rating of overall psychological functioning on a scale of 0 to 100.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders, Text Revision 34 (4th ed. 2000).  A GAF score in the range of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."  Id.

psychiatric-review-technique form.[7]  (AR 210-21.)  Dr. Amado
found that Plaintiff had major depressive disorder, recurrent and
severe, and post-traumatic stress disorder "by history."  (AR
213-14.)  Dr. Amado opined that Plaintiff's mental conditions
resulted in mild restriction of activities of daily living;
moderate difficulties in maintaining social functioning; mild
difficulties in maintaining concentration, persistence, or pace;
and no repeated episodes of decompensation, each of extended
duration.[8]  (AR 218.)

Dr. Amado opined that Plaintiff had "mixed depression and
anxiety symptoms that are being addressed via weekly
psychotherapy sessions and also psych meds prescribed at local
psych clinic."  (AR 220.)  He noted that her symptoms were of
"chronic duration," "partially based on childhood victimization
and family issues, and partially on declining physical health."
(Id.)  Dr. Amado found that Plaintiff "remains cognitively intact
and able to participate in therapy, she is free of overt
psychosis and confusion, and she has not decompensated or
developed new psych conditions requiring reassessment."  (Id.)

---

[7]     Although Dr. Amado's reports do not state his specialty
(see, e.g., AR 210-21, 228-30), the ALJ and Plaintiff both refer
to him as a psychiatrist (AR 23; J. Stip. at 13).

[8]     Social Security regulations define the term "episodes
of decompensation" as "exacerbations or temporary increases in
symptoms or signs accompanied by a loss of adaptive functioning,
as manifested by difficulties in performing activities of daily
living, maintaining social relationships, or maintaining
concentration, persistence, or pace."  20 C.F.R. pt. 404, subpt.
P, app. 1, 12.00(C)(4).  The regulations define the term
"repeated episodes of decompensation, each of extended duration"
as "three episodes within 1 year, or an average of once every 4
months, each lasting for at least 2 weeks."  Id.

He noted that Plaintiff had been adhering to and benefiting from treatment. (<u>Id.</u>) Dr. Amado believed that ALJ Pease's previous finding that Plaintiff was capable of "essentially semi-skilled/nonpublic work activity" should be adopted because more recent medical records "do not compel revision of ALJ findings, as there has been no significant change in circumstances." (<u>Id.</u>)

That same day, Dr. Amado completed a mental-residual-functional-capacity assessment, finding that Plaintiff was "moderately limited" in her ability to interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (AR 228-29.) Dr. Amado found that Plaintiff was not significantly limited in any other area. (<u>Id.</u>)

On June 1, 2009, Dr. Blumberg completed a narrative-report form, listing Plaintiff's diagnoses as major depressive disorder, recurrent and severe, with paranoia; history of post-traumatic stress disorder; and possible bipolar disorder. (AR 192.) On the preprinted form, Dr. Blumberg indicated that Plaintiff had an "anxious" attitude, "clearly organized" thoughts, mildly impaired memory, and mildly impaired judgement. (<u>Id.</u>) He indicated that Plaintiff's symptoms included insomnia, paranoid thoughts, depression, anxiety, panic episodes, suicidal ideation, decreased energy, isolation, apathy, avolition, social withdrawal at times, poor grooming at times, and affective flattening. (<u>Id.</u>) He opined that Plaintiff could not "maintain a sustained level of concentration," "sustain repetitive tasks for an extended

period," "adapt to new or stressful situations," or interact appropriately with coworkers or supervisors. (Id.)  He believed that Plaintiff could interact appropriately with her family members. (Id.)  Dr. Blumberg believed that Plaintiff could not complete a 40-hour workweek without decompensating and that her prognosis was "chronic." (Id.)

On June 17, 2009, Dr. Blumberg noted that Plaintiff was mildly to moderately depressed but had an appropriate and neat appearance, appropriate affect, appropriate attention and concentration, appropriate speech, and no suicidal ideation. (AR 175.)  Dr. Blumberg found that Plaintiff had a partial response to medication and was "symptomatic but stable." (Id.)  On October 14, 2009, Dr. Blumberg noted that Plaintiff had an appropriate and clean appearance, normal and goal-directed thought process, oriented and alert cognition, normal judgment and insight, and no suicidal ideations. (AR 182.)  Plaintiff's mood was calm and mildly to moderately depressed and her affect was blunted. (Id.)  Dr. Blumberg found that Plaintiff was "[s]ymptomatic, but stable." (Id.)

On February 3, 2010, Dr. Blumberg found that Plaintiff had an appropriate and clean appearance, normal and goal-directed thought process, oriented and alert cognition, and adequate judgement and insight. (AR 184.)  She was depressed with blunted affect and slow speech.[9] (Id.)  Plaintiff was calm and did not have any suicidal ideations. (Id.)  That same day, Dr. Blumberg completed a care plan, noting Plaintiff's diagnoses as severe

---

[9]    Dr. Blumberg noted that Plaintiff's slow speech could be secondary to her pain medication. (AR 184.)

14

1    major depression, recurrent, with anxiety.  (AR 189.)

2        On April 13, 2010, Dr. Blumberg noted that Plaintiff had

3    appropriate and clean appearance, full affect, normal and goal-

4    directed thought process, alert and oriented cognition, and

5    adequate judgment and insight.  (AR 441.)  Plaintiff was mildly

6    to moderately depressed but had no suicidal ideations and a

7    partial response to medication.  (Id.)  Dr. Blumberg noted that

8    Plaintiff was "[s]ymptomatic, but stable."  (Id.)  On June 22,

9    2010, Dr. Blumberg noted that Plaintiff was mildly to moderately

10   depressed with intermittent anxiety and panic.  (AR 442.)  He

11   noted that Plaintiff's concentration was mildly decreased,[10] but

12   she had an appropriate and clean appearance, full affect, normal

13   and goal-directed thought process, oriented and alert cognition,

14   adequate judgement, and no suicidal ideations.  (Id.)

15       On August 3, 2010, Dr. Blumberg completed a second narrative

16   report, stating that Plaintiff suffered from recurrent, severe

17   major depressive disorder with paranoia, post-traumatic stress

18   disorder, and possible bipolar disorder.  (AR 445.)  Dr. Blumberg

19   indicated that Plaintiff's symptoms included paranoid thoughts,

20   confusion, insomnia, depression, anxiety, panic episodes,

21   suicidal ideation, decreased energy, isolation, apathy,

22   avolition, social withdrawal, poor grooming, and affective

23   flattening.  (Id.)  He found that Plaintiff's thinking was

24   "[c]learly [o]rganized" but her memory and judgment were mildly

25   impaired.  (Id.)  Dr. Blumberg believed that Plaintiff was unable

26

27       [10]   Although difficult to read, it appears that Dr.
     Blumberg wrote that Plaintiff had "mild ↓ concentration."  (AR
28   442.)

                                    15

to maintain a sustained level of concentration, sustain
repetitive tasks for an extended duration, adapt to new or
stressful situations, or interact appropriately with coworkers
and supervisors; her ability to interact appropriately with
family members "varie[d]." (Id.) He believed Plaintiff was
unable to complete a 40-hour workweek without decompensating.
(Id.) Dr. Blumberg noted that Plaintiff's prognosis was
"chronic" and "guarded for any change" and that her problems were
"compounded by her multiple medical/health problems as reported."
(Id.)

On September 23, 2010, Craig C. Rath, Ph.D, reviewed
Plaintiff's records and completed an interrogatory form at the
ALJ's request. (AR 462-72.) Dr. Rath determined that
Plaintiff's diagnosis was mood disorder, not otherwise specified,
with depressed and anxious features. (AR 468.) Dr. Rath opined
that Plaintiff's ability to understand, remember, and carry out
instructions was not affected by her mental impairments. (AR
463.) He found that Plaintiff was mildly limited in her ability
to interact with the public, moderately limited in her ability to
interact with supervisors and coworkers, and mildly limited in
her ability to respond appropriately to usual work situations and
changes in a routine work setting. (AR 465.) He believed that
Plaintiff had mild restriction of activities of daily living;
moderate difficulties in maintaining social functioning; mild
difficulties in maintaining concentration, persistence, or pace;
and no repeated episodes of decompensation of an extended
duration. (AR 469.) Dr. Rath opined that Plaintiff was
"precluded from any activities involving greater than a moderate

16

degree of stress from all sources, especially interpersonal from supervisors and peers," but "[o]therwise there are no restrictions." (AR 472.) He stated that Plaintiff's impairments did not meet or equal an impairment in a Listing. (AR 470.)

In support of his findings, Dr. Rath cited records from Plaintiff's pain-management doctor, Andrew Thio; some of Dr. Blumberg's treatment notes and his June 2009 narrative report; Dr. Amado's psychiatric-review-technique form and mental-residual-functional-capacity assessment, treatment notes from Plaintiff's primary-care physician, Dr. Oliveira; records from Plaintiff's therapist; and notes from Plaintiff's psychiatric hospitalization. (AR 468-69.) Dr. Rath noted that Plaintiff had a "sporadic treatment record with various mention of degrees of anxiety and depression." (AR 470.) He noted that "no personality disorder [was] mentioned," nothing indicated "bipolar cycling," and Plaintiff's post-traumatic-stress-disorder diagnosis "include[d] no supportive data such as nature or frequency of intrusive recollections or avoidant behavior." (Id.) Dr. Rath noted that the record did contain "mention of anxiety and depression numerous times." (Id.)

3. <u>Analysis</u>

With regard to Plaintiff's mental limitations, the ALJ found that Plaintiff required a work environment with "no more than a moderate degree of stress from all sources, especially interpersonal from supervisors and peers," and could not perform jobs requiring hypervigilance, responsibility for the safety of others, intense personal interactions, or supervising others. (AR 20.) In doing so, the ALJ gave "great weight" to the

17

opinions of the medical expert, Dr. Rath, and state-agency reviewing consultant, Dr. Amado, and "less weight" to Dr. Blumberg's opinions as stated in his two narrative reports.  (AR 23-24.)

        As an initial matter, the ALJ's RFC finding appears to accommodate many of Dr. Blumberg's findings.  For example, in his narrative reports, Dr. Blumberg noted that Plaintiff had only "mild[ly]" impaired memory and judgment (AR 192, 445), which presumably would be accommodated to some extent by her RFC limitation to jobs that do not require hypervigilance or responsibility for the safety of others (AR 20).  Dr. Blumberg also opined that Plaintiff was unable to interact appropriately with coworkers or supervisors or adapt to a new or stressful situation (AR 192), which would be accommodated, at least in part, by the ALJ's RFC limited to "no more than a moderate degree of stress from all sources, especially interpersonal from supervisors and peers," no intense personal interactions, and no supervising others (AR 20).

        To the extent the ALJ rejected Dr. Blumberg's opinion, she provided specific and legitimate reasons, supported by substantial evidence, for doing so.  The ALJ noted that Dr. Blumberg's narrative reports were "basically check off forms" (AR 24), and indeed, the reports were rendered on identical one-page preprinted forms that listed potential diagnostic criteria, symptoms, and other information and left blanks for diagnoses, prescribed medications, and comments (see AR 192, 445).  Dr. Blumberg simply listed Plaintiff's diagnoses and medications and circled items from the lists, without explaining the basis of his

18

finding that Plaintiff's mental condition resulted in significant limitations, such as the inability to maintain a "sustained level" of concentration, sustain repetitive tasks for an extended period, adapt to new or stressful situations, or complete a 40-hour workweek without decompensating. (See AR 192, 445.) The ALJ was entitled to discount Dr. Blumberg's opinion on that basis.[11] See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); De Guzman v. Astrue, 343 F. App'x 201, 209 (9th Cir. 2009) (ALJ was "free to reject" doctor's check-off report that did not explain basis for conclusions); see also Batson, 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported

---

[11]   Plaintiff contends that the ALJ's finding that Dr. Blumberg's opinions were "check off forms for mental status examinations" is "puzzling" because "mental status examinations are a well-established, trusted method of clinical evaluation," which the regulations cite "as an example of the sort of clinical findings medical reports should include." (J. Stip. at 11.) In support, Plaintiff cites 20 C.F.R. § 404.1523(b)(2), but Section 404.1523 does not discuss medical reports and subsection (b)(2) does not exist. See 20 C.F.R. § 404.1523 (stating that agency will consider combined effects of impairments in determining severity). To the extent Plaintiff meant to cite 20 C.F.R. § 404.1513(b), moreover, it fails to establish that the ALJ erroneously rejected Dr. Blumberg's reports. Rather, it states that a doctor should include in a medical report "[c]linical findings (such as the results of physical or mental status examinations)"; the claimant's medical history, laboratory findings, and diagnosis; the "[t]reatment prescribed with response, and prognosis"; and a "statement about what [the claimant] can still do" despite his or her impairments. As discussed, Dr. Blumberg's reports failed to include sufficient clinical findings or other objective evidence to support his conclusion that Plaintiff was significantly limited by her mental impairment.

by the record as a whole . . . or by objective medical findings"
(citation omitted)).  Indeed, Dr. Blumberg's opinion that
Plaintiff was unable to complete a 40-hour workweek was
essentially an opinion on Plaintiff's ultimate disability status,
which the ALJ was not obligated to accept.  See 20 C.F.R.
§§ 404.1527(d)(1) ("A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will
determine that you are disabled."), 416.927(d)(1) (same); SSR
96-5p, 1996 WL 374183, at *5 (treating-source opinions that a
person is disabled or unable to work "can never be entitled to
controlling weight or given special significance"); see also
McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A
disability is an administrative determination of how an
impairment, in relation to education, age, technological,
economic, and social factors, affects ability to engage in
gainful activity.").

The ALJ was also permitted to discount Dr. Blumberg's
narrative reports because they were inconsistent with his
treatment notes.  (AR 24); see Rollins v. Massanari, 261 F.3d
853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating
physician's opinion when opinion was contradicted by or
inconsistent with treatment reports).  As the ALJ noted (AR 24),
Dr. Blumberg's treatment notes consistently stated that Plaintiff
had an "appropriate" or "clean" appearance; appropriate
attention, concentration, and speech; a normal and goal-directed
thought process; oriented and alert cognition; and normal or
adequate judgment and insight – he also frequently noted that
Plaintiff did not suffer from hallucinations, delusions, or

suicidal ideations.  (<u>See, e.g.</u>, AR 175, 182, 184, 197, 201-02,
362, 441).  Indeed, it appears that Dr. Blumberg noted
Plaintiff's decreased concentration only once, in June 2010, and
even then he noted that it was "mild."  (<u>See</u> AR 442.)  Such
consistently normal or mild findings fail to support Dr.
Blumberg's opinion that Plaintiff was so significantly disabled
by her mental impairments that she was unable to, for example,
maintain concentration, perform repetitive tasks, interact with
coworkers, or complete a normal workweek without decompensating.
(<u>See</u> AR 192, 445.)  The ALJ was therefore entitled to reject it.
<u>Thomas</u>, 278 F.3d at 957 ("The ALJ need not accept the opinion of
any physician, including a treating physician, if that opinion is
brief, conclusory, and inadequately supported by clinical
findings.").

      The ALJ was also entitled to rely on the opinions of medical
expert Rath and nonexamining psychiatrist Amado to reject Dr.
Blumberg's opinions.  (AR 24); <u>see</u> <u>Morgan v. Comm'r of Soc. Sec.</u>
<u>Admin.</u>, 169 F.3d 595, 602 (9th Cir. 1999) ("we have consistently
upheld the Commissioner's rejection of the opinion of a treating
or examining physician, based <i>in part</i> on the testimony of a
nontreating, nonexamining medical advisor"); <u>Andrews v. Shalala</u>,
53 F.3d 1035, 1042-43 (9th Cir. 1995) (ALJ permissibly rejected
opinion of examining psychologist based in part on testimony of
nonexamining medical advisor); <u>Magallanes v. Bowen</u>, 881 F.2d 747,
752 (9th Cir. 1989) (ALJ permissibly rejected opinion of treating
physician based in part on testimony of nonexamining medical
expert).  As the ALJ noted, Drs. Rath's and Amado's opinions were
consistent with the objective evidence as well as with each

other.  (AR 23-24); see Thomas, 278 F.3d at 957 ("The opinions of
non-treating or non-examining physicians may also serve as
substantial evidence when the opinions are consistent with
independent clinical findings or other evidence in the record.");
see also 20 C.F.R. §§ 404.1527(c)(4) (ALJ will generally give
more weight to opinions that are "more consistent . . . with the
record as a whole"), 416.927(c)(4) (same).  For example, Dr.
Rath's findings that Plaintiff's impairments did not affect her
ability to understand, remember, and carry out instructions and
resulted in only "mild" difficulties in maintaining
concentration, persistence, and pace (AR 469) were consistent
with Dr. Blumberg's findings in the narrative reports that
Plaintiff had clearly organized thought and only mildly impaired
memory and judgment (see, e.g., AR 192, 445) and his treatment
notes consistently finding that Plaintiff had appropriate
attention and concentration (see, e.g., AR 175, 197, 201-02,
362), oriented and alert cognition, and a normal and goal-
directed thought process (AR 182, 184, 441-42).  Dr. Rath also
correctly found that Plaintiff's diagnosis of post-traumatic
stress disorder included "no supportive data such as nature or
frequency of intrusive recollections or avoidant behavior," while
her diagnosis of bipolar disorder was unsupported by any finding
or data showing "[b]ipolar cycling."  (AR 470.)  Dr. Amado
similarly found that Plaintiff had only mild difficulties in
maintaining concentration, persistence, and pace; mild
restriction of activities of daily living; moderate difficulties
in maintaining social functioning; and no episodes of
decompensation of an extended duration.  (AR 218.)  In support of

22

1   his findings, Dr. Amado noted that Plaintiff was "cognitively

2   intact," able to participate in therapy, and "free of overt

3   psychosis and confusion," among other things.  (AR 220.)  And

4   Drs. Rath and Amado reviewed Plaintiff's full medical records

5   before rendering their opinions, which also supports the ALJ's

6   finding that their opinions were entitled to more weight.  See 20

7   C.F.R. §§ 404.1527(c)(6) (extent to which doctor is "familiar

8   with the other information in [claimant's] case record" is

9   relevant factor in determining weight given to opinion),

10  416.927(c)(6) (same).

11      Plaintiff contends that Dr. Rath "omit[ted] all discussion"

12  of Plaintiff's psychiatric hospitalization "despite his having

13  been hired by the state agency for the sole purpose of reviewing

14  and analyzing the medical records." (J. Stip. at 12.)  But Dr.

15  Rath's report reflects that he did consider those records: he

16  specifically noted that they reflected a diagnosis of post-

17  traumatic stress disorder, a GAF score of 25, and Plaintiff's

18  reported history of sexual abuse.  (AR 468-69.)  In any event,

19  Plaintiff's psychiatric hospitalization was isolated and brief,

20  lasting only four days (see AR 196), and thereafter Plaintiff

21  reported that she was no longer suicidal and felt "a lot better"

22  (AR 242), which was consistent with Dr. Blumberg's subsequent

23  treatment notes stating that Plaintiff had no suicidal ideations

24  (see AR 175, 182, 184, 197, 441-42).  The fact that Dr. Rath

25  failed to discuss Plaintiff's hospitalization in more detail

26  therefore does not establish that the ALJ erroneously relied on

27  his opinion.

28      Plaintiff is not entitled to remand on this ground.

23

1          B.    The ALJ Properly Assessed Plaintiff's Credibility

2          Plaintiff argues that the ALJ "fail[ed] to articulate a

3    legally valid or factually accurate rationale for finding that

4    [Plaintiff's] testimony lack[ed] credibility" and that the

5    "adverse credibility finding was made without the support of

6    substantial evidence and warrants remand." (J. Stip. at 19.)

7          An ALJ's assessment of pain severity and claimant

8    credibility is entitled to "great weight." See Weetman v.

9    Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

10   F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to

11   believe every allegation of disabling pain, or else disability

12   benefits would be available for the asking, a result plainly

13   contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674

14   F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and

15   citation omitted). In evaluating a claimant's subjective symptom

16   testimony, the ALJ engages in a two-step analysis. See

17   Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must

18   determine whether the claimant has presented objective medical

19   evidence of an underlying impairment [that] could reasonably be

20   expected to produce the pain or other symptoms alleged." Id. at

21   1036 (internal quotation marks omitted). If such objective

22   medical evidence exists, the ALJ may not reject a claimant's

23   testimony "simply because there is no showing that the impairment

24   can reasonably produce the *degree* of symptom alleged." Smolen,

25   80 F.3d at 1282 (emphasis in original). When the ALJ finds a

26   claimant's subjective complaints not credible, the ALJ must make

27   specific findings that support the conclusion. See Berry v.

28   Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent affirmative

evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

In a function report dated April 16, 2009, Plaintiff stated that her daily activities consisted of making breakfast for herself and her grandson, sitting in her recliner, putting ice or a heating pad on her back, napping, walking "a little," and taking her medication.  (AR 155.)  She said that she takes care of her grandson by "po[uring] cereal" for him about "once a month."  (AR 156.)  She could cook for only about 10 minutes at a time and did not clean or do yard work.  (AR 157.)  Plaintiff said she did not drive because she would "get scared when cars come at [her]" and would "close [her] eyes."  (AR 158.)  She said she once "woke up in the middle of the nigh[t] and took the car and tr[i]ed to hit a telephone pole" but "ended up missin[g] and rip[p]ed [her] bumper."  (AR 159.)  Plaintiff said she did not go out alone because she had anxiety attacks, fell a lot, and did not do well with "a lot of people."  (AR 158.)  She shopped for groceries and clothes about once a month for an hour at a time. (Id.)  Plaintiff asserted that she was unable to pay bills, handle a checking account, or use checks or money orders, and she would get confused when counting money.  (AR 158-59.)  Plaintiff said she had trouble getting along with others and "just like[d] to be alone."  (AR 160.)

Plaintiff reported that her illnesses affected her ability

25

to lift, squat, bend, stand, reach, walk, sit, kneel, climb
stairs, see, remember, complete tasks, concentrate, understand,
follow instructions, use her hands, and get along with others.
(Id.)  She could lift only five pounds, and the farthest she
could walk without resting for five or 10 minutes was "from [the]
bedroom to [the] garage."  (Id.)  Plaintiff said she could pay
attention for five minutes when she was "lucky" and could not
handle stress.  (AR 160-61.)  She said she did not like for other
people to change her routine, but she liked to "change things"
herself.  (AR 161.)  She reported that she would "see people in
the shadows of [her] home" but would not be scared and would
"just go on with what [she was] doing."  (Id.)

     At the September 29, 2010 hearing before the ALJ, Plaintiff
testified that she lived with her husband, 10-year-old son, 22-
year-old daughter, and four-year-old grandson; her husband was
"on Social Security" for "medical reasons" and her daughter,
grandson, and herself received other public assistance.[12]  (AR
506-07.)  Plaintiff testified that she was not able to work
because mentally she couldn't "keep up" and physically her back
was "ruined."  (AR 508.)  She testified that her doctors had
given her cortisone shots and "burn[ed] the nerves" in her back,
which had helped her back pain "[a] little bit."  (AR 508-09.)
Plaintiff said she felt anxious around a lot of people, had been

_____

     [12]   Although Plaintiff indicated that her husband was
apparently disabled, in her disability report she stated,
somewhat inconsistently, that her husband took care of their
animals, cooked for the family, reminded her to take showers,
kept all her pain medications and gave them to her when needed,
cleaned the outside of the house once or twice a week, paid all
the bills, and wrote all the checks.  (AR 156-58.)

hospitalized in March 2009 for suicidal thoughts, and still experienced suicidal thoughts "[s]ometimes . . . every day." (AR 511-12.)  Plaintiff testified that the medication she took for her depression helped "[a] little bit," and her asthma was doing "[a] lot better." (AR 508, 511.)  Plaintiff testified that she had "severe carpal tunnel" in both hands and, as a result, could not "grasp something heavy," had to use two hands to grasp an empty pan, and got hand cramps after "two lines of writing something." (AR 508, 510.)  Plaintiff testified that she could sit for about 15 minutes before having to stand up and that the heaviest item she could lift was her hairbrush; she could not lift a carton of milk because she would drop it. (AR 513.)

     The ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but her "statements regarding the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" Plaintiff's RFC for a limited range of light work. (AR 21.)  The ALJ gave legally sufficient reasons for discounting Plaintiff's credibility to the extent it was inconsistent with her RFC.

     First, the ALJ was entitled to discount Plaintiff's credibility based on her many "no-shows" for mental-health appointments "at a time when [Plaintiff] was reporting significant disabling symptoms." (AR 24); see Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (in assessing credibility, ALJ may rely on "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment'" (quoting Smolen, 80 F.3d at 1284)); Bunnell

27

1   v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc) (ALJ may

2   consider "unexplained, or inadequately explained, failure to seek

3   treatment or follow a prescribed course of treatment" (internal

4   quotation marks and citation omitted)); SSR 96-7p, 1996 WL

5   374186, at *7 (claimant's statements "may be less credible if the

6   level or frequency of treatment is inconsistent with the level of

7   complaints, or if the medical reports or records show that the

8   individual is not following the treatment as prescribed and there

9   are no good reasons for this failure").   Indeed, the record shows

10  that Plaintiff failed to report to at least eight appointments

11  with Dr. Blumberg between September 2008 and March 2010 (AR 177,

12  181, 183, 198, 206-07, 366, 440), and nothing indicates that her

13  failure to report for treatment was a result of her mental

14  impairments, see Molina, 674 F.3d at 1113-14 (ALJ permissibly

15  discounted credibility based on failure to seek psychiatric care

16  for anxiety disorder when "no medical evidence" showed that

17  claimant's resistence to treatment "was attributable to her

18  mental impairment rather than her own personal preference").

19       Plaintiff contends that the ALJ erroneously discounted her

20  credibility based on her many missed psychiatric appointments

21  because the Ninth Circuit, in Regennitter v. Comm'r of Soc. Sec.

22  Admin., 166 F.3d 1294, 1299-1300 (9th Cir. 1999), "criticized the

23  use of a lack of treatment to reject mental complaints" and noted

24  that "it is a questionable practice to chastise one with a mental

25  impairment for the exercise of poor judgment in seeking

26  rehabilitation." (J. Stip. at 19 (internal quotation marks

27  omitted).)   In Regennitter and similar cases, however, the

28  plaintiff failed to seek any mental health treatment at all.   See

28

1   _Regennitter_, 166 F.3d at 1299-1300 (ALJ improperly discounted

2   examining physician's opinion based on plaintiff's "failure,

3   because of his poverty, to seek treatment by any mental

4   professional" (internal quotation marks omitted)); _Nguyen v._

5   _Chater_, 100 F.3d 1462, 1465 (9th Cir. 1996) ("the fact that

6   claimant may be one of millions of people who did not seek

7   treatment for a mental disorder until late in the day is not a

8   substantial basis on which to conclude that [physician's]

9   assessment of claimant's condition is inaccurate"); _Blankenship_

10  _v. Bowen_, 874 F.2d 1116, 1124 (9th Cir. 1989) ("Appellant may

11  have failed to seek psychiatric treatment for his mental

12  condition, but it is a questionable practice to chastise one with

13  a mental impairment for the exercise of poor judgment in seeking

14  rehabilitation."). Here, by contrast, Plaintiff sought and

15  received mental-health treatment but simply failed to comply with

16  her treatment regimen by skipping her scheduled appointments.

17  Nothing in the record indicates that she did so as a result of

18  her mood disorder.

19      Second, the ALJ's finding that Plaintiff's alleged symptoms

20  were not supported by objective evidence was a clear and

21  convincing reason for discounting Plaintiff's credibility.  (AR

22  24 (noting that Plaintiff's complaints appeared "so extreme as to

23  appear implausible, especially in light of the lack of objective

24  physical and mental findings"); _see also_ AR 21 ("There is no

25  evidence from an objective medical perspective to indicate that

26  [Plaintiff] is incapable of performing work at a light level of

27  exertion.")); _see Carmickle_, 533 F.3d at 1161 ("Contradiction

28  with the medical record is a sufficient basis for rejecting the

claimant's subjective testimony."); <u>Lingenfelter</u>, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); <u>Kennelly v. Astrue</u>, 313 F. App'x 977, 979 (9th Cir. 2009) (same). Indeed, Plaintiff complained that her "severe" carpal tunnel syndrome prevented her from grasping even an empty pan or lifting anything heavier than her hairbrush (AR 508, 510, 513), but as the ALJ found (AR 22), EMG studies showed only "mild" bilateral carpal tunnel syndrome (AR 406-08), and Plaintiff's pain-management doctor, Dr. Thio, found that Plaintiff's upper extremities had normal sensation and "5/5" motor function, with no swelling or redness (AR 268). The ALJ also noted that an April 2007 lumbar-spine MRI, which was part of the record of Plaintiff's previous adjudication, had shown "a 3 mm disc protrusion at the L5-S1 level with a small annular tear, and disc dessication," and that "no additional studies" demonstrated "a more significant back disorder." (AR 21; <u>see also</u> AR 36 (ALJ Pease's summary of lumbar-spine MRI).) The ALJ noted Dr. Thio's finding that Plaintiff had reduced range of motion and tenderness of the back but normal sensation and full motor function in her lower extremities (AR 22, 269), and she accommodated those findings by limiting Plaintiff's RFC to only occasional posturals and no climbing or working at unprotected heights. (AR 22.) Indeed, Plaintiff fails to challenge the ALJ's finding that Plaintiff's subjective symptom

testimony was not supported by the objective medical evidence.
(See J. Stip. at 17-19.)

Finally, the ALJ was entitled to discount Plaintiff's
credibility based on her inconsistent statements regarding her
daily activities.  See Smolen, 80 F.3d at 1284 (ALJ may use
"ordinary techniques of credibility evaluation," such as "prior
inconsistent statements concerning the symptoms, and other
testimony by the claimant that appears less than candid");
Thomas, 278 F.3d at 958-59 (in assessing credibility, ALJ may
consider inconsistencies either in claimant's testimony or
between testimony and conduct); cf. Molina, 674 F.3d at 1113
("Even where [claimant's] activities suggest some difficulty
functioning, they may be grounds for discrediting the claimant's
testimony to the extent that they contradict claims of a totally
debilitating impairment.").  The ALJ noted that in March 2007,
during the previous adjudication, Plaintiff had reported to an
examining physician that she "was able to attend to self care in
terms of dressing and bathing herself," drive a car, and get
rides from friends, and that her daily activities included
"household chores, yard and gardening work, preparing meals,
going to the store, running errands and getting her son ready for
school."  (AR 19; see also AR 34-35 (ALJ Pease's decision noting
Plaintiff's report of daily activities).)  Although the medical
evidence fails to establish any significant worsening of
Plaintiff's medical conditions since the previous adjudication,
Plaintiff subsequently claimed, in her April 2009 function report
and at the September 2010 hearing, that she was unable to perform
any chores or yard work, cook for more than 10 minutes at a time,

31

or drive a car; she also said she could walk only from her bedroom to the garage and lift only the weight of her hairbrush. (See AR 157-58, 160, 513); see Chavez, 844 F.2d at 693 (to overcome "presumption of continuing nondisability arising from the first [ALJ's] findings of nondisability," claimant "must prove changed circumstances indicating a greater disability" (citation and internal quotation marks omitted)).  Thus, the ALJ reasonably concluded that Plaintiff's previous report of fairly normal activities "indicates that [Plaintiff's] daily activities maybe [sic] somewhat greater than" those reported in Plaintiff's more recent disability report.  (AR 19.)  Plaintiff, moreover, fails to challenge this finding.  (See AR 17-19.)

One of the ALJ's credibility findings, however, might not have been clear and convincing.  The ALJ found that Plaintiff received only "conservative care" for her back disorder, "includ[ing] a series of epidural injections and medication management."  (AR 21-22; see also AR 24 (noting that Plaintiff's "treatment for her pain complaints has been conservative in nature").)  Indeed, in addition to pain medications, Plaintiff underwent three epidural injections (AR 255-56, 259-62), three rounds of lumbar-facet and sacroiliac-joint injections (AR 415, 418, 425), and a radiofrequency bilateral lumbar facet neurotomy[13] (AR 432).  Epidural and trigger-point injections,

---

[13]   Radiofrequency neurotomy is a procedure to reduce back and neck pain by using heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain signals.  Radiofrequency neurotomy, Mayo Clinic, http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947 (last updated Jan. 24, 2012).

however, may not be consistent with a finding of conservative treatment.  <u>See</u> <u>Tagle v. Astrue</u>, No. CV-11-7093-SP, 2012 WL 4364242, at *4 (C.D. Cal. Sept. 21, 2012) ("While physical therapy and pain medication are conservative, epidural and trigger point injections are not."); <u>Christie v. Astrue</u>, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize steroid, trigger-point, and epidural injections as conservative).  Despite that potential error, however, remand is not required because the remainder of the ALJ's credibility findings were supported by substantial evidence in the record.  <u>See</u> <u>Carmickle</u>, 533 F.3d at 1162; <u>Batson</u>, 359 F.3d at 1197.  This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff.  <u>See</u> <u>Tommasetti</u>, 533 F.3d at 1039.  Reversal is therefore not warranted on this basis.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[14] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: June 4, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[14]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

34